IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| AFFILIATED FOODS MIDWEST COOPERATIVE, INC., a Nebraska corporation, | ) ) ) ) | Case No. _____ |
| Plaintiff, | ) ) | |
| vs. | ) ) | **NOTICE OF REMOVAL** |
| SUPERVALU INC., a Delaware corporation, | ) ) ) | |
| Defendant. | ) | |

COMES NOW Defendant, SUPERVALU Inc. ("SUPERVALU"), by and through its counsel, and pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, hereby removes this lawsuit from the District Court of Madison County, Nebraska, to the United States District Court for the District of Nebraska. In support thereof, SUPERVALU states as follows:

1.     On October 11, 2016, Plaintiff, Affiliated Foods Midwest Cooperative, Inc. ("AFM"), filed a Complaint against SUPERVALU. A true and correct copy of the Complaint is attached hereto as Exhibit "A."

2.     On October 11, 2016, AFM served the Complaint upon SUPERVALU.

3.     The Complaint alleges SUPERVALU tortiously interfered with certain alleged agreements between AFM and Borowiak IGA Foodliner, Inc. ("Borowiak") relating to AFM's supply and distribution of grocery products and other items to Borowiak. (See AFM's Complaint, ¶¶ 14-21, 49-62.)

4.     AFM alleges Borowiak allegedly agreed to purchase at least $17 million in goods per year from AFM for at least a five-year term, commencing on December 29, 2015. (Id., at ¶¶ 23, 26.)

5.     AFM claims that on or about October 7, 2016, Borowiak informed AFM it would no longer purchase goods from AFM, allegedly breaching its alleged agreements with AFM. (Id., at ¶ 47.) AFM claims Borowiak allegedly stopped purchasing goods from AFM due to SUPERVALU's alleged tortious interference. (Id., at ¶¶ 49-62.)

6.     The Complaint alleges AFM has incurred damages due to SUPERVALU's alleged tortious interference, including "potential loss of customers, loss of sales, dilution of AFM's goodwill, loss of value to AFM's network of retail grocery stores, reduction in AFM's ability to compete in the market place, confusion for existing and potential customers, and injury to AFM's reputation." (Id., at ¶¶ 55, 62.)

7.     AFM is a Nebraska corporation, with its principal place of business located in Norfolk, Nebraska.

8.     SUPERVALU is a Delaware corporation, with its principal place of business located in Eden Prairie, Minnesota.

9.     Removal to the United States District Court for the District of Nebraska is proper because there is complete diversity of citizenship between the parties to this lawsuit and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. 28 U.S.C. §§ 1332, 1441, and 1446.

10.    On October 12, 2016, SUPERVALU filed with the District Court of Madison County, Nebraska, a Notice of Removal and served a written copy of the Notice upon AFM's counsel.

11.    SUPERVALU requests a trial by jury on all matters raised in the above-captioned lawsuit and prays that the Court holds such jury trial in the United States District Court located in Omaha, Nebraska.

WHEREFORE, SUPERVALU requests removal of the above-captioned lawsuit from the District Court of Madison County, Nebraska, to the United States District Court for the District of Nebraska and that a jury trial be held in the United States District Court located in Omaha, Nebraska.

DATED this 12th day of October, 2016.

SUPERVALU INC., Defendant

By:    /s/ *Michael F. Coyle*
        Michael F. Coyle, #18299
        Jordan W. Adam, #23723
        FRASER STRYKER PC LLO
        500 Energy Plaza
        409 South 17th Street
        Omaha, NE 68102
        (402) 341-6000 (telephone)
        (402) 341-8290 (facsimile)
        mcoyle@fraserstryker.com
        jadam@fraserstryker.com
        ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing Notice of Removal was served by electronic mail and regular U.S. Mail, postage prepaid, this 12th day of October, 2016, to:

Daniel J. Fischer
Koley Jessen P.C., L.L.O.
One Pacific Place, Suite #800
1125 South 103rd St.
Omaha, NE 68124
dan.fischer@koleyjessen.com

David E. Copple
Copple, Rockey, McKeever
  & Schlecht P.C., L.L.O.
2425 Taylor Ave.
Norfolk, NE 68702-0078
decopple@greatadvocates.com

By:    /s/ *Michael F. Coyle*, #18299

10304/1525417

- 3 -

Filed in Madison District Court
*** EFILED ***
Case Number: D07CI160000418
Transaction ID: 0004353334
Filing Date: 10/11/2016 12:06:41 PM CDT

## IN THE DISTRICT COURT FOR MADISON COUNTY, NEBRASKA

| | | |
|---|---|---|
| AFFILIATED FOODS MIDWEST<br>COOPERATIVE, INC., a Nebraska<br>corporation, | ) <br> ) <br> ) <br> ) | Case No. _____ |
| Plaintiff, | ) <br> ) | |
| vs. | ) <br> ) | **COMPLAINT** |
| SUPERVALU INC., a Delaware<br>corporation, | ) <br> ) <br> ) <br> ) | |
| Defendant, | ) | |

Plaintiff Affiliated Foods Midwest Cooperative, Inc. ("AFM" or "Plaintiff"), states the following as its Complaint against the Defendant SuperValu Inc. ("Defendant" or "SuperValu").

### The Parties, Jurisdiction, and Venue

1.      Plaintiff Affiliated Foods Midwest Cooperative, Inc. is a Nebraska corporation, authorized to do business in Nebraska and with its principal office address located at 13th Street and Omaha Avenue, Norfolk, Nebraska 68701.

2.      Defendant SuperValu Inc. is a foreign corporation organized under the laws of the State of Delaware and with its principal office located at 11840 Valley View Road, Eden Prairie, Minnesota 55344.

3.      SuperValu is registered to do business in the state of Nebraska and, it comes into the state of Nebraska to transact business.

4.      This Court has jurisdiction over the subject matter of this action as the court of general, original jurisdiction pursuant to Neb. Rev. Stat. § 24-302.

5.      This Court has jurisdiction over Defendant pursuant to Neb. Rev. Stat. § 25-536 because Defendant transacts business in Nebraska, has registered with the Secretary of State's


EXHIBIT
A

Office as a foreign corporation in Nebraska, and has caused or threatened to cause tortious injury by an act in Nebraska.

6.    Venue is proper in this Court pursuant to Neb. Rev. Stat. § 25-403.01(3) and (4) because the transaction out of which the cause of action arose took place in Madison County, Nebraska, and because Defendant is a nonresident of Nebraska.

**Factual Background**

7.    Plaintiff AFM is in the business of selling grocery products and other items to retail grocery stores.

8.    As part of its ongoing business, AFM regularly enters into long-term supply agreements with its customers when it makes loans or other financial accommodations to its customers.

9.    The primary consideration for AFM's agreement to loan money to customers is the customer's agreement to have its grocery products primarily supplied by AFM for a defined period of time. In other words, but for the agreement to forego the right to be primarily supplied by others for a defined period of time, AFM would not make loans or financial accomodations to customers.

10.    The presence of the long-term agreements is vital in the competitive grocery wholesale industry in which AFM competes. The agreements are additionally important to AFM's competitive viability because the agreements assist AFM in effectively and cost-efficiently ordering, warehousing and transporting grocery products to the individual retail grocery stores.

11.    Defendant SuperValu Inc. ("SuperValu") similarly is in the business of selling grocery products and other items to retail grocery stores.

12.    AFM and SuperValu are direct competitors in the grocery wholesale market.

2

12.     AFM and SuperValu are direct competitors in the grocery wholesale market.

13.     Borowiak IGA Foodliner, Inc. ("Borowiak") owns a group of seven (7) retail grocery stores, each of which are located in Illinois and operating under the Borowiak's IGA name.

14.     On or about December 29, 2015, AFM and Borowiak entered into a series of agreements that resulted in Borowiak committing to AFM that AFM would be Borowiak's primary supplier of grocery products and other items for an extended period of time (at least five years) (the "December 29 Agreements").

15.     Specifically, on or about December 29, 2015, AFM agreed to loan Borowiak $1,700,000 for the improvement of Borowiak's retail grocery stores.

16.     On or about December 29, 2015, Borowiak executed one specific Promissory Note to AFM (the "Promissory Note") to memorialize and evidence the above-referenced loan.

17.     The Promissory Note provided that Borowiak would pay the principal sum of $1,700,000, with interest at the rate of two percent (2%) per annum.

18.     Interest on the Promissory Note was below market rate and it was, essentially, unsecured or under-secured.

19.     The Promissory Note further provided that, in the event of a default of the Promissory Note, the outstanding and unpaid balance and accrued interest under the Promissory Note shall become due and payable, and any and all amounts in default shall bear interest at a per annum rate equal to the Prime Rate plus three percent (3%)

20.     Also, on or about December 29, 2015, and as a condition to AFM making the above-described loan, AFM and Borowiak entered into a Supply Agreement (the "Borowiak

3

Supply Agreement"). A copy of the Borowiak Supply Agreement is attached hereto as **Exhibit A**.

21. The Borowiak Supply Agreement provides, among other things, that AFM will be the primary supplier of goods for the Borowiak grocery stores.

22. AFM supplies Borowiak with some of its grocery products from its (AFM's) Norfolk facility.

23. The Borowiak Supply Agreement is for a term of at least five (5) years, commencing on December 29, 2015, but if the loan has not been repaid by the fifth year, the Borowiak Supply Agreement will continue in full force and effect until that time when the loan has been repaid in full (the "Term").

24. The primary consideration for AFM making a virtually unsecured loan at below market rate of interest, AFM received a minimum five (5) year commitment from Borowiak that Borowiak would purchase its grocery products and other items from AFM.

25. In other words, in return for the loan at favorable terms, Borowiak, for the most part, gave up its right to purchase grocery products from other suppliers.

26. Among other things, the Borowiak Supply Agreement provides that Borowiak will purchase at least $17,000,000 in goods per year and at least $85,000,000 in goods from AFM during the term of the Borowiak Supply Agreement.

27. Since the execution of the December 29 Agreements, AFM has been the primary supplier to the Borowiak retail stores.

28. Borowiak is one of AFM's largest customers and the seven Borowiak stores are an important component of AFM's grocery distribution network.

29. SuperValu has knowledge of the December 29 Agreements.

4

30.    Beginning around December 29, 2015, the Borowiak retail stores were "tagged" by AFM.   The term "tagging" refers to the process where a physical label is affixed to the grocery store shelves identifying the UPC Code of the respective products on the shelves and cross-referenced to the wholesale supplier's inventory numbers.   The "tagging" of a store facilitates ordering of product from the retailer's primary wholesale supplier.

31.    The tagging of a store is essentially the first step in a wholesale supplier (such as AFM) providing grocery products and other items to a retail grocery store (such as Borowiak).

32.    Since December 29, 2015, Borowiak has spent all, or nearly all, of the $1,700,000 loaned under the Promissory Note to add equipment to its stores, update equipment at its stores, add additional square footage to stores, add new departments to stores, employ additional labor and provide new or updated interiors and exteriors to the stores.

33.    AFM is currently in the process of selling its business, which is set to close on October 23, 2016.   There is no guaranty that the sale will close, as there are several conditions that must be met first.

34.    At a minimum, AFM, per the December 29 Agreements, is and will remain the primary supplier to Borowiak until October 23, 2016.

35.    If AFM's sale is not consummated, it will continue to supply AFM.   If, however, the sale is consummated, the December 29 Agreements will be assigned to the buyer and the buyer will have the contractual right to supply Borowiak.

36.    Since AFM announced its proposed sale, SuperValu has been working with Borowiak to induce Borowiak into breaching the December 29 Agreements.

5

37.   For example, starting sometime in August of 2016, Borowiak and SuperValu began the process of moving the Borowiak business from AFM to SuperValu, including without limitation, SuperValu beginning the process of re-tagging the Borowiak stores.

38.   Borowiak has acknowledged to AFM that SuperValu and Borowiak have been working together to transition the supply of grocery products and other goods from AFM to SuperValu.

39.   Borowiak has offered to repay the $1,700,000 Promissory Note that AFM made to Borowiak.

40.   Based on the financial statements that Borowiak has provided to AFM, Borowiak does not have the financial resources to immediately repay the $1,700,000 Promissory Note.

41.   AFM is aware that SuperValu has offered to pay off the monetary advances of other retail grocery stores that have supply agreements with AFM to induce the stores to breach their agreements with AFM.

42.   On or about September 6, 2016, AFM sent Defendant a letter instructing the defendant to cease and desist in any tortious interference with its (AFM's) contract and/or business relationship with Borowiak.  A copy of the September 6, 2016 Letter is attached as **Exhibit B**.

43.   On or about September 13, 2016, AFM sent Defendant a follow up letter, advising the defendant to immediately cease interfering with AFM's existing contract and/or business relationship with Borowiak.  A copy of the September 13, 2016 Letter is attached as **Exhibit C**.

44.   On September 16, 2016, Defendant sent AFM a letter acknowledging the contractual relationship between AFM and Borowiak.  Although SuperValu claimed in its September 16 letter that it was not interfering with the contractual relationship between AFM

6

and Borowiak, it also led AFM to believe that it (SuperValu) ceased its plans to re-tag and supply Borowiak stores. A copy of the September 16, 2016 Letter is attached as **Exhibit D**.

45.     At the same time, Borowiak, in an effort to keep AFM from exercising its rights under the Promissory Note and Borowiak Supply Agreement, stated to AFM its (Borowiak's) desire to remain supplied by AFM in lieu of being liable for damages.

46.     Unbeknownst however to AFM, SuperValu and Borowiak continued to work behind the scenes to strategize to do indirectly what it could not do directly.

47.     On October 7, 2016, Borowiak further breached the December 29 Agreements described herein when it informed AFM that it was terminating its ACH authorization to pay for grocery products that AFM delivered to the Borowiak retail stores because it was no longer going to be purchasing from AFM. A copy of the October 7, 2016, e-mail correspondence from Borowiak is attached as **Exhibit E**.

48.     On October 10, 2016, SuperValu began re-tagging the Borowiak retail stores. By re-tagging the stores, the UPC Code of the respective products on the shelves are now tied to SuperValu's system and will shut AFM out of the process of providing product to its customer, Borowiak, pursuant to the December 29 Agreements.

### COUNT I
### Tortious Interference with Contract

49.     Plaintiff adopts and incorporates Paragraphs 1 through 48 as if fully set forth in this paragraph.

50.     AFM has a valid contract with Borowiak whereby Borowiak is obligated to purchase goods from AFM and its assigns for a minimum of five (5) years from December 29, 2015.

51.     Defendant knew and continues to know of the Borowiak Supply Agreement.

52.    Defendant has and continues to unjustifiably interfere with Borowiak Supply Agreement by inducing and/or attempting to induce Borowiak to breach its contracts with AFM.

53.    Defendant's attempts to induce and/or inducements of Borowiak to breach the Borowiak Supply Agreement include, but are not limited to, its offering to loan money to Borowiak to pay off the $1,700,000 loan from AFM, attempting to retag the stores and/or actually re-tagging the stores, and inducing Borowiak to sell down the AFM grocery products.

54.    Defendant's interference with AFM's contract has caused AFM to face the imminent threat of irreparable harm.

55.    The threat of harm AFM faces is both imminent and irreparable, and includes the potential loss of customers, loss of sales, dilution of AFM's goodwill, loss of value to AFM's network of retail grocery stores, reduction in AFM's ability to compete in the market place, confusion for existing and potential customers, and injury to AFM's reputation.

56.    AFM will also suffer damages as a direct and proximate result of Defendant's misconduct.

## COUNT II

### Tortious Interference with Business Relations

57.    Plaintiffs adopt and incorporate paragraphs 1 through 56 as if fully set forth in this paragraph.

58.    AFM has a valid business relationship with Borowiak, wherein AFM serves as the primary supplier of goods for Borowiak's retail sales in its grocery stores with the expectation that Borowiak will purchase at least $17,000,000 in goods per year from AFM and its assigns for a period of at least five years.

59.     Defendant knew and continues to know of AFM's business relations with Borowiak.

60.     Defendant has and continues to unjustifiably interfere with AFM's business relations with Borowiak by inducing and/or attempting to induce Borowiak to discontinue its relationship with AFM. Defendant's attempts to unjustifiably interfere include, but are not limited to, Defendant offering to loan money to Borowiak to pay off the $1,700,000 loan from AFM, attempting to retag the stores and/or actually retagging the stores, and inducing Borowiak to sell down AFM grocery products.

61.     Defendant's interference with AFM's contract has caused AFM to face the imminent threat of irreparable harm.

62.     The threat of harm AFM faces is both imminent and irreparable, and includes the potential loss of customers, loss of sales, dilution of AFM's goodwill, loss of value to AFM's network of retail grocery stores, reduction in AFM's ability to compete in the market place, confusion for existing and potential customers, and injury to AFM's reputation. AFM will suffer damages as a direct and proximate result of Defendant's misconduct.

WHEREFORE, Plaintiff respectfully requests that this Court enter Judgment in its favor and against Defendant SuperValu Inc. and that the Court:

- Permanently enjoin Defendant SuperValu Inc. from interfering with AFM's contractual and business relationships;

- Enjoining SuperValu from re-tagging the Borowiak stores;

- Enjoining SuperValu from supplying any of the Borowiak stores during the term of the Borowiak Supply Agreement;

- Ordering SuperValu to remove its tags from any of the products that it has tagged to date;

- Award Plaintiff AFM its actual damages; and

- Award Plaintiff any further relief that the Court deems appropriate and just.

DATED: October 11, 2016.

AFFILIATED FOODS MIDWEST
COOPERATIVE INC.,
Plaintiff,

By: /s/ Daniel J. Fischer
Daniel J. Fischer, 22272
*Attorneys for Plaintiff*
One Pacific Place, Suite 800
1125 South 103 Street
Omaha, NE 68124
Telephone: (402) 390.9500
Fax: (402) 390.9005
Email: Dan.Fischer@koleyjessen.com

And

David E. Copple, #17274
Attorney for Plaintiff
Copple, Rockey, McKeever
& Schlecht P.C., L.L.O.
2425 Taylor Avenue
P.O. Box 78
Norfolk, NE  68702-0078
Telephone:  402.371.4300
Facsimile:  402.371.0790
Email: decopple@greatadvocates.com

## SUPPLY AGREEMENT

This Supply Agreement (this "Agreement"), dated as of December 29, 2015 (the "Effective Date"), is entered into between Affiliated Foods Midwest Cooperative, Inc., a Nebraska corporation ("Supplier"), and Borowiak IGA Foodliner, Inc., an Illinois corporation ("Buyer").

WHEREAS, Supplier is in the business of selling foodstuffs and other items to retail groceries;

WHEREAS, Buyer owns a group of retail grocery stores operating under the Borowiak's IGA name; and

WHEREAS, Buyer desires to purchase from Supplier, and Supplier desires to sell to Buyer the Goods (defined below), subject to the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for good and valuable consideration, the receipt sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.   Purchase and Sale of Goods.

    (a)   Purchase and Sale.  Subject to the terms and conditions of this Agreement, during the Term (defined below), Supplier shall sell to Buyer, and Buyer shall purchase from Supplier, the goods supplied by Supplier and ordered by Buyer for resale in Buyer's retail grocery locations (the "Goods").  Buyer agrees that during the Term, Supplier will be Buyer's primary supplier of goods for retail sales in its grocery stores (each a "Store").  Supplier and Buyer covenant and agree that they have entered into this Agreement upon the expectation that Buyer will purchase at least $17,000,000 in Goods per year (the "Annual Purchase Expectation") from Supplier and at least $85,000,000 in Goods from Supplier (the "Total Purchase Expectation") during the five (5) year Term of this Agreement.  This Agreement is expressly limited to the terms of this Agreement and the Basic Purchase Order Terms (defined below) contained in any applicable purchase order provided by Buyer and accepted by Supplier.  For purposes of this Agreement, the term "Basic Purchase Order Terms" shall mean collectively, any one or more of the following terms specified by Buyer in a purchase order submitted to Supplier:  (i) a list of the Goods to be purchased; (ii) the quantity of each of the Goods ordered; (iii) the requested delivery date; and (iv) the delivery location where Supplier is to deliver the Goods.  The terms of this Agreement shall prevail over any terms or conditions in any other documentation and expressly exclude any of Buyer's general terms and conditions contained in any purchase order or other document issued by Buyer.  In the event of any conflict between the terms of this Agreement and the terms of any purchase order or any other document issued by Buyer, the terms of this Agreement shall prevail.

    (b)   Order Procedure.  Buyer shall initiate purchase orders via electronic ordering device.  By placing a purchase order (by any means), Buyer makes an offer to purchase the Goods pursuant to the terms and conditions of this Agreement, including the Basic Purchase Order Terms, and on no other terms.  Except with respect to the Basic Purchase Order Terms, any variations made to the terms and conditions of this Agreement by Buyer in any purchase order are void and have no effect.  Supplier has the right, in its sole discretion, to

4829-7496-3500.2

accept or reject any purchase order submitted by Buyer. Supplier may accept any purchase order by confirming the order (whether by written confirmation, invoice or otherwise), or by delivering such Goods, whichever occurs first. No purchase order submitted by Buyer is binding on Supplier, unless accepted by Supplier, as provided in this Agreement.

2.      Pricing and Freight.

(a)      Price. Buyer shall purchase the Goods from Supplier under Supplier's Full Member Co-Op Program at the sell price of the Goods in effect at the time that Supplier accepts the applicable purchase order from Buyer (the "Prices"). Supplier shall package and deliver all Goods pursuant to an accepted purchase order from Supplier's location to the delivery location set forth in Buyer's purchase order, or at the option of Buyer, Buyer may arrange for its own delivery of Goods from Supplier's location to Buyer's desired shipping destination. If Buyer does not arrange for its own delivery of Goods, for delivery charges made by Supplier, Supplier will charge Buyer Supplier's then standard freight charges for the applicable Goods ("Freight Charges"). On a weekly basis as of the close of Supplier's business each Friday, Supplier shall provide Buyer a statement (each a "Statement") for each Store for the prior seven (7) days' Goods ordered and Freight Charges, and shall provide the Buyer a Statement which sets forth all Goods ordered and Freight Charges for the Buyer for the prior seven (7) days. Each Statement will include an additional charge equal to one percent (1%) of each Store's Prices for Goods ordered during the prior seven (7) days (sometimes referred to internally by Supplier as the purchasing fee, and referred to herein as the "Standard Charge"). Each Statement shall be paid pursuant to the payment terms set forth on Schedule A, a copy of which is attached hereto and incorporated by this reference.

3.      Advance of Patronage Rebates/Payment of Patronage Rebates. Effective as of the Effective Date, Supplier shall extend an advance (the "Patronage Rebate Advance") of $1,700,000 to Buyer. Supplier shall pay to Buyer fifty percent (50%) of the Patronage Rebate Advance via check upon completion of the tagging of Buyer's Stores and shall pay to Buyer the remaining fifty percent (50%) of the Patronage Rebate Advance via check within sixty (60) days thereafter. On an annual basis, following Supplier's regularly scheduled September annual meeting, Supplier shall calculate and notify Buyer of the amount of the patronage rebate (the "Patronage Rebate") that Buyer earned during Supplier's prior fiscal year ending in June. Supplier shall pay the Patronage Rebate to Buyer in accordance with Supplier's customary terms of payment of the Patronage Rebate. Buyer shall repay the Patronage Rebate Advance to Supplier on an annual basis by Supplier offsetting twenty percent (20%) of the Patronage Rebate Advance plus interest accrued under the Patronage Rebate Advance Note (the "Annual Patronage Rebate Advance Repayment") against the Patronage Rebate that would otherwise be paid to Buyer. In addition to the terms set forth in this Agreement, the terms of repayment of the Patronage Rebate Advance shall be set forth in a Promissory Note (the "Patronage Rebate Advance Note"), a copy of which is attached hereto as Schedule B and incorporated by this reference. Buyer shall execute the Patronage Rebate Advance Note upon execution of this Agreement. Upon execution of this Agreement, Buyer shall also execute a Security Agreement (the "Security Agreement"), a copy of which is attached hereto as Schedule C and incorporated by this reference, to secure Buyer's obligations under the Patronage Rebate Advance Note. Any amount of Patronage Rebate in excess of the Annual Patronage Rebate Advance Repayment shall be paid by Supplier to Buyer in accordance with Supplier's customary terms of payment of Patronage Rebates. In the event that the amount of the Patronage Rebate to be

EXHIBIT A

paid to Buyer for any year is less than the Annual Patronage Rebate Advance Payment, then Buyer shall pay such difference to Supplier within thirty (30) days of Buyer's receipt of notice from Supplier of such deficiency.   In the event that this Agreement is terminated for any reason whatsoever, all remaining unpaid amounts under the Patronage Rebate Advance Note shall become immediately due and payable.

4.   <u>Term and Termination.</u>   The term of this Agreement shall commence on the Effective Date and continue for a period of five (5) years (the "Term"); provided, however, in the event that all of the Patronage Rebate Advances have not been repaid in full by Buyer before the end of the Term or if the Total Purchase Expectation has not been attained before the end of the Term, then the Term shall automatically be extended to the last day of the calendar month in which all Patronage Rebate Advances have been paid in full.   Notwithstanding the foregoing, this Agreement may be terminated earlier as follows: (a) by mutual written agreement of the parties; (b) by Supplier in the event that Buyer is more than fourteen (14) days delinquent in its payment of its Statements; (c) by Supplier effective immediately in the event that Buyer files or has filed against it a petition in bankruptcy or for reorganization, or is adjudicated bankrupt, or becomes insolvent, or makes an assignment for the benefit of its creditors, or suffers the appointment of a receiver for any of its assets, or discontinues its business; or (d) by Supplier in the event of a material breach of this Agreement by Buyer in the event that Buyer has failed to cure such breach within fifteen (15) days of Buyer's receipt of notice of such breach from Supplier.

5.   <u>Confidentiality.</u>

(a)   <u>Scope of Confidential Information.</u>   From time to time during the Term, either party (as the "Disclosing Party") may disclose or make available to the other party (as the "Receiving Party") information about its business affairs, goods and services, trade secrets, third-party confidential information and other sensitive or proprietary information, as well as the terms of this Agreement, whether orally or in written, electronic or other form or media, and whether or not marked, designed or otherwise identified as "confidential" (collectively, "Confidential Information").   Confidential Information does not include information that, at the time of disclosure: (i) is or becomes generally available to and known by the public other than as a result of, directly or indirectly, any breach of this Section 6(a); (ii) is or becomes available to the Receiving Party on a non-confidential basis from a third-party source, provided that such third-party is not and was not prohibited from disclosing such Confidential Information; (iii) was known by or in the possession of the Receiving Party prior to being disclosed by or on behalf of the Disclosing Party; or (iv) is required to be disclosed pursuant to applicable law.

(b)   <u>Protection of Confidential Information.</u>   The Receiving Party shall: (i) protect and safeguard the confidentiality of the Disclosing Party's Confidential Information with at least the same degree of care as the Receiving Party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care; (ii) not use the Disclosing Party's Confidential Information, or permit it to be accessed or used, for any purpose other than to exercise its rights to perform its obligations under this Agreement; and (iii) not disclose any such Confidential Information to any person, except to the Receiving Party's representatives who need to know the Confidential Information to assist the Receiving Party, or act on its behalf, to exercise its rights or perform its obligations under this Agreement.

3

6.   <u>Liquidated Damages</u>.  Buyer and Supplier acknowledge and agree that Supplier has and will expend considerable sums in order to perform under this Agreement and has foregone other opportunities in order to provide the Goods and services offered hereunder to Buyer. Accordingly, in the event that this Agreement is terminated due to the default or breach of Buyer prior to Buyer's attainment of the Total Purchase Expectation, Buyer agrees and accepts without reservation that such breach or default will cause substantial and irreparable harm to Supplier in which money damages would be impossible or very difficult to calculate, and in such event of a breach or default by Buyer, Buyer agrees that it shall pay upon demand from Supplier, the following amounts as liquidated damages and not as a penalty (in addition to all other amounts as may be owed or due to Supplier), and that such amounts are reasonable in light of the anticipated or actual harm that would be caused to Supplier due to such default or breach:

(a)    an amount equal to three percent (3%) multiplied by the amount by which the the Total Purchase Expectation exceeds the amount of Goods purchased by Buyer under this Agreement.

7.   <u>Miscellaneous</u>.

(a)    <u>WAIVER OF WARRANTIES</u>.  SUPPLIER EXPRESSLY DISCLAIMS ALL EXPRESS AND IMPLIED WARRANTIES ARISING FROM OPERATION OF LAW, OR ARISING FROM TRADE USAGE OR COURSE OF DEALING, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

(b)    <u>LIMITATION OF LIABILITY</u>.  IN NO EVENT WILL SUPPLIER BE LIABLE TO BUYER OR TO ANY THIRD PARTY (WHETHER ARISING BY TORT, INCLUDING NEGLIGENCE, BREACH OF CONTRACT OR OTHERWISE, AND WHETHER OR NOT SUCH LOSS OR DAMAGE IS FORESEEABLE, FORESEEN OR KNOWN) FOR ANY LOSS OF USE, REVENUE, PROFIT OR GOOD WILL, OR FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES. IN NO EVENT WILL SUPPLIER'S LIABILITY ARISING OUT OF OR RELATED TO ANY CLAIM OF ANY KIND, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, EXCEED THE PRICE SET FORTH IN THE PURCHASE ORDER TO WHICH SUCH CLAIM RELATES.

(c)    <u>Right of Offset</u>.  Each party agrees that in addition to the other rights of offset afforded to Supplier hereunder, in the event of termination or expiration of this Agreement, for any reason whatsoever, to the extent that Buyer has not repaid in full all obligations to Supplier set forth herein or set forth in the Patronage Rebate Advance Note, Supplier shall have the right, in addition to its other rights under this Agreement, at law or in equity, to withhold and offset any amounts owed to Buyer (including the right to offset and withhold any amounts owed pursuant to the Patronage Rebate Advance Note and any debentures issued by Supplier to Buyer) until such obligations of Buyer have been paid to Supplier in full.

(d)    <u>Relationship of Parties</u>.  Nothing in this Agreement creates any agency, joint venture or partnership or other form of joint enterprise, employment or fiduciary relationship

EXHIBIT A

between the parties hereto. Neither party hereto has any expressed or implied right or authority to assume or create any obligations on behalf of or in the name of the other party, or to bind the other party to any contract, agreement or undertaking with any third-party.

(e)   Entire Agreement.  This Agreement, including all schedules, together with the Basic Purchase Order Terms, constitutes the sole and entire agreement of the parties hereto with respect to the subject matter contained herein and supersedes all prior and contemporaneous understandings and agreements with respect to such subject matter.

(f)   Severability.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement.  Upon a determination that any term or provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement to affect the original intent of the parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

(g)   Amendment and Modification.  No amendment to or modification of this Agreement is effective unless it is in writing and signed by each party hereto.

(h)   Waiver.  No waiver under this Agreement is effective unless it is in writing from the applicable party waiving its right.  Any waiver authorized on one occasion is effective only in that instance, and only for the purpose stated and does not operate as a waiver on any future occasion.

(i)   Assignments; Successors and Assigns.  Buyer may not assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of Supplier, such consent not to be unreasonably withheld.  For purposes of this Agreement, an assignment shall include a voluntary or involuntary assignment, including by operation of law, merger (whether or not Buyer is the surviving corporation), change in control of Buyer or any other manner.  Any purported assignment or delegation in violation of this section is null and void.  This Agreement is binding on and inures to the benefit of the parties hereto and their respective permitted successors and permitted assigns.

(j)   Governing Law; Venue; Waiver of Jury Trial.  This Agreement shall be governed by and construed in accordance with the laws of the State of Nebraska, without regard to the conflict of law provisions thereof.  EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTIONS OR LIABILITIES ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.  Any suit or other proceeding arising out of or relating to this Agreement may be brought in the courts of Madison County, Nebraska or, if it has or can acquire jurisdiction, in the United States District Court for the District of Nebraska, and each of the parties hereto irrevocably submits to the exclusive jurisdiction of each such court in any such suit or proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the suit or proceeding shall be heard and determined only in any such court and agrees not to bring any suit or proceeding arising out of or relating in any manner to this Agreement in any other court.

EXHIBIT A

(k)   <u>Counterparts</u>.   This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same instrument.  A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**[The Remainder of This Page Intentionally Left Blank; Signature Page Follows.]**

4829-7496-3500.2

6

EXHIBIT A

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**SUPPLIER:**

Affiliated Foods Midwest Cooperative, Inc., a Nebraska corporation

By: _____

Its: _____VP / CFO_____

**BUYER:**

Borowiak IGA Foodliner, Inc., an Illinois corporation

By: _____

Its: _____PRESIDENT_____

Supply Agreement
Signature Page

EXHIBIT A

PROMISSORY NOTE

$1,700,000.00

Effective as of December  29  , 2015
Norfolk, Nebraska

FOR VALUE RECEIVED, Borowiak IGA Foodliner, Inc., an Illinois corporation ("Borrower"), hereby promises to pay to the order of Affiliated Foods Midwest Cooperative, Inc., a Nebraska corporation (herein with its successors and assigns "Lender"), the principal sum of $1,700,000.00, with interest at the rate of two percent (2%) per annum, in the following manner.

1.      Principal and Interest Payments.  Absent an Event of Default, payment of principal and interest under this Promissory Note shall be due and payable in 25 equal installments with each installment being due and payable on September 15, November 15, January 15, February 15 and March 15 of each calendar year, beginning September 15, 2016 (each a "Payment Date"); provided, however, that Borrower and Lender may mutually agree in writing that the payments to be made during the first five (5) Payment Dates may be at a lesser amount to reflect Borrower not having purchased a full year of Goods from Lender during such time period.  The entire outstanding and unpaid amounts of this Promissory Note shall be paid in full on or before March 15, 2021.  It is anticipated that payments of principal and interest under this Promissory Note shall be made as an offset against the Patronage Rebate to be paid to Borrower by Lender on each Payment Date.  In the event that the amount of Patronage Rebates to be paid to Borrower for Goods ordered during Lender's prior fiscal year is less than [$ 340,000.00] then Borrower shall be required on September 15 of such applicable year to pay to Lender an amount equal to the difference between [$ 340,000.00] and the amount of Patronage Rebates Lender has notified Borrower it will receive for Goods ordered during Lender's prior fiscal year (the "Deficiency Payment"); provided, however, that Borrower and Lender may mutually agree in writing that the Deficiency Payment shall not be due on September 15, 2016 to reflect Borrower not having purchased a full year of Goods from Lender on such date.

2.      Prepayment.  This Promissory Note may be prepaid in whole or in part at any time without penalty.  Each payment made on this Promissory Note shall be credited first to any interest then due and second to the outstanding principal balance hereof.

3.      Form of Payment.  All payments shall be payable in lawful money of the United States of America in immediately available funds to Lender at 1301 Omaha Avenue, Norfolk, Nebraska 68701, or at such other place as Lender may from time to time designate in writing.

4.      Events of Default.  Each of the following occurrences shall constitute an event of default under this Promissory Note (herein called "Event of Default"):

(a)     Borrower shall fail to pay any installment of principal or interest when due under this Promissory Note;

(b)     Borrower shall fail to use all proceeds under this Promissory Note for the sole purpose of upgrading its retail grocery store locations and purchasing related equipment;

(c)     Borrower shall fail to pay any Deficiency Payment on the date when due;

4848-5479-8124.2

EXHIBIT A

(d)    Any event of default shall occur under any indebtedness for borrowed money owed by Borrower to any other lender of Borrower (other than Lender) if the effect thereof (with or without the giving of notice or lapse of time or both) is to accelerate, or permit the holder(s) of such indebtedness to accelerate the maturity of any such indebtedness; or the holder of any lien or security interest (other than Lender) shall commence foreclosure of such lien or security interest upon any property of Borrower;

(e)    Borrower or any guarantor of this Promissory Note shall admit in writing its inability to pay its debts generally as they become due; file a petition in bankruptcy or petition to take advantage of any insolvency act; make an assignment for the benefit of its creditors; commence a proceeding for the appointment of a receiver, trustee, liquidator or conservator of itself or of the whole or any substantial part of its property; or file a petition or answer seeking reorganization or arrangement or similar relief under Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable state legal requirements relating to bankruptcy, insolvency or creditors' rights (collectively, the "Bankruptcy Code");

(f)    Borrower or any guarantor of this Promissory Note shall be adjudged bankrupt; or a court of competent jurisdiction shall enter an order, judgment or decree appointing a receiver, trustee, liquidator or conservator of Borrower or any guarantor of this Promissory Note, or of the whole or any substantial part of Borrower's or any such guarantor's properties, or approve a petition filed against Borrower or any guarantor of this Promissory Note seeking reorganization or similar relief under the Bankruptcy Code; or if, under the Bankruptcy Code, a court of competent jurisdiction shall assume custody or control of Borrower or any guarantor of this Promissory Note, or of the whole or any substantial part of Borrower's or any such guarantor's properties; or if there is commenced against Borrower or any guarantor of this Promissory Note any petition or proceeding under the Bankruptcy Code and such proceeding or petition remains undismissed for a period of 30 days; or if Borrower or any guarantor of this Promissory Note by any act indicated Borrower's or any such guarantor's consent to, approval of or acquiescence in any such proceeding or petition;

(g)    If there is a default or breach by Borrower under that certain Supply Agreement between Borrower and Lender (the "Supply Agreement"); or

(h)    In the event that the Supply Agreement is terminated for any reason whatsoever and any amounts remain unpaid under this Promissory Note.

5.    <u>Remedies Upon Event of Default</u>.  Upon the occurrence of any Event of Default described in <u>Section 4</u> above, the outstanding and unpaid principal balance and accrued interest under this Promissory Note shall become due and payable at once at the election of the Lender without any presentment, demand, protest or notice of any kind.  Upon the occurrence of any Event of Default, any and all amounts in default shall bear interest at a per annum rate equal to the Prime Rate (as defined below) then in effect <u>plus</u> 3%, until such payments are paid in full.  The failure of Lender to exercise the option to accelerate, or any other rights to which Lender may be entitled, shall not constitute a waiver of the right to exercise such option or other rights in the event of any subsequent Event of Default.  "Prime Rate" means the prime rate quoted in the "Money Rates" section of *The Wall Street Journal*; provided, however, if for any

4848-5479-8124.2                                    2

reason such rate is no longer published in *The Wall Street Journal* or otherwise available from another readily determinable market source, Lender shall use some other readily determinable index that most closely approximates such rate.

6.      Setoff.  In addition to any rights now or hereafter granted under the provisions of any applicable law, rule or regulation and, not by way of limitation of any such rights, upon the occurrence of any Event of Default described in Section 4 above, Lender is hereby authorized by Borrower, at any time or from time to time, without notice to Borrower or to any other person or entity, any such notice being hereby expressly waived, to setoff and to appropriate and to apply any and all patronage rebates and amounts payable under any debentures issued by Lender to Borrower and any other indebtedness at any time held or owing by Lender to or for the credit or account of Borrower against the obligations and liabilities of Borrower to Lender under this Promissory Note.

7.      Costs and Expenses.  Borrower hereby agrees to pay all reasonable costs and expenses, including reasonable attorneys' fees to the extent permitted by applicable law, incurred by Lender in connection with the enforcement or collection of this Promissory Note.

8.      Waiver.  To the fullest extent permitted by applicable law, Borrower, for itself and its successors and assigns, hereby expressly waives presentment, demand, protest, notice of dishonor, and any and all other notices, demands and consents in connection with the delivery, acceptance, performance, default or enforcement of this Promissory Note, and hereby consents to any extensions of time, renewals, releases of any party to or guarantor of this Promissory Note, waivers and any other modifications that may be granted or consented to by Lender from time to time in respect of the time of payment or any other provision of this Promissory Note.

9.      Governing Law and Consent to Forum.  This Promissory Note shall be governed by and construed in accordance with the laws of the State of Nebraska without regard to conflict of laws principles.  Borrower hereby consents to the jurisdiction of any state court located in Madison County, Nebraska as the exclusive venue and forum.  Borrower hereby waives and agrees not to assert in any such action, suit or proceeding that Borrower is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in any inconvenient forum or that the venue of the action, suit or proceeding is improper. Nothing contained in this Section 9 shall limit or restrict the right of Lender to commence any proceeding in any federal or state courts located in the state where Borrower resides or maintains its chief executive office, as applicable, or in any other state, to the extent Lender deemed such proceeding necessary or advisable to exercise remedies available under this Promissory Note.

10.     TRIAL BY JURY.  BORROWER AND LENDER HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, SUIT, COUNTERCLAIM, CROSSCLAIM OR OTHERWISE, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THIS PROMISSORY NOTE OR ANY ACTS OR OMISSIONS OF LENDER AND ITS OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  BORROWER AND LENDER ARE EACH HEREBY AUTHORIZED TO FILE A

COPY OF THIS <u>SECTION 10</u> IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.

11.     <u>Defined Terms</u>.  Any capitalized terms used in this Promissory Note and not otherwise defined herein shall have the meanings ascribed to them in the Supply Agreement.

**[The Remainder of this Page Intentionally Left Blank.  Signature Page to Follow.]**

EXHIBIT A

IN WITNESS WHEREOF, this Promissory Note has been signed, executed and delivered by Borrower as of the day and year first above written.

BORROWER:

Borowiak IGA Foodliner, Inc., an Illinois corporation

By: _____

Its: _____PRESIDENT_____

Signature Page
Promissory Note

EXHIBIT A

## GUARANTY

In consideration of Affiliated Foods Midwest Cooperative, Inc., a Nebraska corporation ("Lender"), accepting this Promissory Note and lending the sums provided for herein, the undersigned ("Guarantor") hereby unconditionally and irrevocably guarantees, as a principal obligor and not merely as a surety, to Lender and its successors and assigns, any and all obligations of Borrower set forth in this Promissory Note (the "Obligations"). Guarantor agrees to pay on demand, if not immediately paid by Borrower, all amounts owed to Lender pursuant to the Obligations. This Guaranty is and is intended to be a continuing guaranty of the Obligations, independent of and in addition to any other guaranty, endorsement, collateral or other agreement with respect thereto. This Guaranty is absolute and unconditional and shall not be changed or affected by any representation, oral agreement, act or thing whatsoever, except as herein provided. This Guaranty may not be amended, changed, modified, altered or terminated without the written consent of Lender, and such consent shall be effective only in that specific instance and for the specific purpose for which it is given. Guarantor covenants that it has submitted to Lender a personal financial statement, in form satisfactory to Lender, prior to the execution of the Promissory Note, and will provide such other personal financial statements, in form satisfactory to Supplier, as Supplier may reasonably request while any Obligations under the Promissory Note remain outstanding. This Guaranty shall be governed by and construed in accordance with the laws of the State of Nebraska without regard to conflict of laws principles. Guarantor hereby consents to the jurisdiction of any state court located in Madison County, Nebraska as the exclusive venue and forum. Guarantor hereby waives and agrees not to assert in any such action, suit or proceeding that Guarantor is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in any inconvenient forum or that the venue of the action, suit or proceeding is improper. GUARANTOR HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT HE MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTIONS OR LIABILITIES ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS GUARANTY.

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed as of _____12-29_____, 20 15.

_Trevor Borowiak_

## GUARANTY

In consideration of Affiliated Foods Midwest Cooperative, Inc., a Nebraska corporation ("Supplier"), entering into this Supply Agreement, the undersigned (the "Guarantor") hereby unconditionally and irrevocably guarantees, as principal obligor and not merely as surety, to Supplier and its successors and assigns, any and all obligations of Buyer set forth in this Supply Agreement, including, without limitation, the obligations of Buyer set forth in the Security Agreement and the Patronage Rebate Advance Note (the "Obligations"). The Guarantor agrees to pay on demand, if not immediately paid by Buyer, all amounts owed to Supplier pursuant to the Obligations. This Guaranty is and is intended to be a continuing guaranty of the Obligations, independent of and in addition to any other guaranty, endorsement, collateral or other agreement with respect thereto. This Guaranty is absolute and unconditional and shall not be changed or affected by any representation, oral agreement, act or thing whatsoever, except as herein provided. This Guaranty may not be amended, changed, modified, altered or terminated without the written consent of Supplier, and such consent shall be effective only in that specific instance and for the specific purpose for which it is given. The Guarantor covenants that it has submitted to Supplier a personal financial statement, in form satisfactory to Supplier, prior to the execution of the Supply Agreement, and will provide such other personal financial statements, in form satisfactory to Supplier, as Supplier may reasonably request during the term of the Supply Agreement. This Guaranty shall be governed by and construed in accordance with the laws of the State of Nebraska without regard to conflict of laws principles. Guarantor hereby consents to the jurisdiction of any state court located in Madison County, Nebraska as the exclusive venue and forum. Guarantor hereby waives and agrees not to assert in any such action, suit or proceeding that Guarantor is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in any inconvenient forum or that the venue of the action, suit or proceeding is improper. GUARANTOR HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT HE MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTIONS OR LIABILITIES ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS GUARANTY.

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed as of the Effective Date.

Trevor Borowiak

4829-7496-3500.2

EXHIBIT A

**SCHEDULE A:**
**Statement Payment Terms**

Supplier will issue each Statement to each Store as of close of Supplier's business each Friday for the prior seven (7) days' Goods, services, Freight Charges and all other fees. For the first 16 months of the Term, on the Wednesday following the Friday on which the applicable Statement was issued, an ACH from Buyer's bank account shall be initiated by Supplier for amounts due to Supplier for the applicable Statement. After the first 16 months of the Term, an ACH from Buyer's bank account shall be initiated by Supplier for amounts due to Supplier for the applicable Statement on the Monday following the Friday on which the applicable Statement was issued. In the event that a Wednesday or Monday, as applicable, is a legal holiday, such that the nearest Federal Reserve Bank is closed, the ACH will be initiated on the next business day that such bank is open. Buyer shall make all payments via ACH transfer in accordance with instructions to be delivered from Supplier.

EXHIBIT A

**SCHEDULE B:**
Patronage Rebate Advance Note

4829-7496-3500.2

EXHIBIT A

**SCHEDULE C:**
**Security Agreement**

EXHIBIT A

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the "Agreement") is made and entered into effective as of December __29__, 2015, by and between Borowiak IGA Foodliner, Inc., an Illinois corporation ("Debtor"), and Affiliated Foods Midwest Cooperative, Inc., a Nebraska corporation (herein with its successors and assigns "Secured Party").

## WITNESSETH:

WHEREAS, for purposes of securing that certain Promissory Note effective of even date herewith in the principal amount of $1,700,000 that was executed by Debtor in favor of Secured Party (and all promissory notes given in exchange, renewal or substitution thereof, the "Promissory Note"), and to induce Secured Party to accept the Promissory Note, the Debtor hereby agrees as follows:

1.     Security Interest and Collateral.  As security for the full and timely payment of all amounts that may become due and owing under the Promissory Note, Debtor hereby grants to Secured Party a security interest (herein called the "Security Interest") in the following property of Debtor (hereinafter called the "Collateral"):

(a)     All patronage rebates and other rebates to be paid by Secured Party to Debtor and all proceeds thereof regardless if such rebates are in the name of Debtor, a tradename, d/b/a, store name or otherwise;

(b)     All debentures issued or to be hereafter issued by Secured Party and registered in Debtor's name (the "Debentures") regardless if such Debentures are in the name of Debtor, a tradename, d/b/a, store name or otherwise; and

(c)     All present and future income, proceeds, earnings, increases, and substitutions from or for the Debentures of every kind and nature, including without limitation all payments, interest, profits, distributions, benefits, rights, options, warrants, dividends, stock dividends, stock splits, stock rights, regulatory dividends, subscriptions, monies, claims for money due and to become due, bonds issued in substitution or exchange for any Debentures, and all other property Debtor is entitled to receive on account of such Debentures (collectively, the "Bond Income and Proceeds").

2.     Financing Statement and Others Acts.  Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to file financing or continuation statements and/or amendments thereto and Debtor shall execute and deliver such other instruments and documents as may be reasonably requested by Secured Party to perfect, confirm and further evidence the Security Interest hereby granted to Secured Party and shall pay the fees incurred in filing all such financing statements or other instruments or documents.

Upon request of Secured Party, Debtor will promptly do all other acts and things, and will execute and file all other instruments reasonably deemed necessary by Secured Party under applicable law to establish, maintain and continue Secured Party's perfected Security Interest in the Collateral and to effectuate the intent of this Agreement and will pay all costs and expenses of filing and recording or promptly reimburse Secured Party if such costs and expenses are incurred by Secured Party, including the costs of any searches deemed necessary by Secured Party to establish, determine or maintain the validity and the priority of the Security Interest

4838-9882-4492.2

EXHIBIT A

granted to Secured Party, and pay or otherwise satisfy all other claims and charges which in the opinion of Secured Party might prejudice, imperil or otherwise affect the Collateral or Secured Party's Security Interest therein. A photocopy of this Agreement shall be deemed an original for purposes of filing or recording.

3.     Representations, Warranties and Agreements of the Debtor.   Debtor hereby represents, warrants and agrees that:

(a)     Debtor is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois and is duly licensed and qualified to transact business in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it make such licensing or qualification necessary. This Agreement has been duly authorized by all necessary corporation action on the part of Debtor, and the Promissory Note has been duly authorized by all necessary corporation action on the part of Debtor.

(b)     Debtor has or will have absolute title to each item of Collateral free and clear of all security interests, liens and encumbrances, except the Security Interest herein granted to Secured Party, and will defend the Collateral against all claims or demands of all persons other than Secured Party. Debtor will not sell or otherwise dispose of the Collateral or any interest therein without the prior written consent of Secured Party.

4.     Covenants.   Debtor hereby agrees that until the Promissory Note is paid in full, Debtor shall:

(a)     Furnish Secured Party quarterly financial statements for Debtor within thirty-five (35) days after the end of each quarter and audited annual financial statements for Debtor within sixty (60) days after the end of Debtor's fiscal year end (including, without limitation, balance sheets, profit and loss statements and statements of cash flow), all prepared in accordance with generally accepted accounting principles.

(b)     Keep accurate books of record and accounts for Debtor in which true and complete entries will be made in accordance with generally accepted accounting principles consistently applied. Debtor shall give Secured Party and its representatives access and permission to audit, examine, copy or make extracts from, any and all books, records and documents in Debtor's possession and to discuss its affairs, finances and accounts with the officers of the Debtor, all at such times during normal business hours and as often as Secured Party may reasonably request.

(c)     Ensure no other security interests in or pledges of any of the Collateral will hereafter be made or given other than to Secured Party.

(d)     Surrender the certificates representing the Debentures to Secured Party.

5.     Default.   Debtor shall be in default under this Agreement upon the occurrence of any one or more of the following events or conditions (each of which is an "Event of Default"):

(a)     Any Event of Default (as defined in the Promissory Note) shall occur;

4838-9882-4492.2

2

EXHIBIT A

(b)     Debtor's breach or failure to perform any covenant, promise, condition, obligation or liability contained or referred to herein if not cured within thirty (30) days following notice of such breach or failure from Secured Party; or

(c)     Any representation or warranty made by Debtor in this Agreement was false in any material respect when made to Secured Party.

6.     <u>Remedies Upon Event of Default</u>. Upon the occurrence of an Event of Default and at any time thereafter, Secured Party may exercise any one or more of the following rights or remedies:

(a)     Exercise and enforce any or all rights and remedies available upon default to a secured party under the Uniform Commercial Code.

(b)     Transfer and register in Secured Party's name or in the name of Secured Party's nominee the whole or any part of the Debentures, to exchange any certificates or instruments representing or evidencing the Debentures for certificates or instruments of smaller or larger denominations, and to collect and receive all Bond Income and Proceeds from the Debentures.

(c)     In exercising any of Secured Party's rights or remedies under this Section 6, Debtor hereby irrevocably constitutes and appoints Secured Party as the proxy and attorney-in-fact of Debtor with respect to the Collateral, with full power of substitution to do so. The appointment of Secured Party as proxy and attorney-in-fact is coupled with an interest and shall be irrevocable until the Promissory Note is paid in full. The appointment of Secured Party as proxy and attorney-in-fact shall include the right to exercise all rights, powers, privileges and remedies to which a holder of the Collateral would be entitled (including executing endorsements, assignments and instruments in the name of Debtor as shall be necessary or reasonable). Such proxy shall be effective automatically and without the necessity of any other action upon the occurrence of an Event of Default. Notwithstanding the foregoing, Secured Party shall not have any duty to exercise any such right or to preserve the same and shall not be liable for any failure to do so or for any delay in doing so.

(d)     Debtor agrees that Debtor will not interfere with any right, power or remedy of Secured Party provided for in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise, or the exercise or beginning of the exercise by Secured Party of any one or more of such rights, powers or remedies. No failure or delay on the part of Secured Party to exercise any such right, power or remedy and no notice or demand which may be given to or made upon Debtor by Secured Party with respect to any such remedies shall operate as a waiver thereof, or limit or impair Secured Party's right to take any action or to exercise any power or remedy hereunder, without notice or demand, or prejudice its rights as against Debtor in any respect.

(e)     Debtor acknowledges that a breach of any of the covenants contained in this Section 6 will cause irreparable injury to Secured Party, that Secured Party shall have no adequate remedy at law in respect of such breach and, as a consequence, agrees that each and every covenant contained in this Section 6 shall be specifically enforceable against Debtor.

EXHIBIT A

(f)      Exercise or enforce any or all other rights or remedies available to Secured Party by law or agreement against the Collateral, against the Debtor or against any other person or property.

7.     Miscellaneous.  Debtor and Secured Party further agree as follows:

(a)     Governing Law; Venue.  This Agreement shall be governed by and construed in accordance with the laws of the State of Nebraska without regard to conflict of laws principles, except to the extent that the validity or perfection of the Security Interest hereunder, or remedies hereunder, in respect of any particular Collateral are governed by the laws of a jurisdiction other than the State of Nebraska. The parties hereby consent to the jurisdiction of any state court located in Madison County, Nebraska as the exclusive venue and forum.  The parties hereby waive and agree not to assert in any such action, suit or proceeding that such party is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in any inconvenient forum or that the venue of the action, suit or proceeding is improper.

(b)     Recitals.  The recitals and introductory paragraphs hereof are a part hereof, form a basis for this Agreement, and shall be considered prima facie evidence of the facts and documents referred to therein.

(c)     Non-Waiver.  Waiver of or acquiescence by Secured Party in any default by Debtor, or failure of Secured Party to insist upon strict performance by Debtor of any warranties, agreements or other obligations contained in this Agreement shall not constitute a waiver of any subsequent or other default, failure or waiver of strict performance, whether similar or dissimilar.

(d)     Modifications.  No modification of any provision of this Agreement, no approvals required from Secured Party and no consent by Secured Party to any departure therefrom by Debtor shall be effective unless such modification, approval or consent shall be in writing and signed by an authorized representative of Secured Party, and the same shall then be effective only for the period and on the conditions and for the specific instances and purposes specified in such writing.  No notice to or demand on Debtor in any case shall entitle Debtor to any other or further notice or demand in similar or other circumstances.

(e)     Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

(f)     Notices.  Except as otherwise provided in this Agreement, any notice, consent or other communication required or permitted under this Agreement shall be deemed given when (i) delivered personally; (ii) sent by confirmed facsimile; or (iii) three (3) days after being sent by certified or registered mail or one (1) day after being sent by nationally recognized overnight courier.  Rejection or other refusal to accept or the inability to deliver because of change of address of which no notice was given shall be deemed to constitute receipt of the communication sent.  Names, addresses and

EXHIBIT A

facsimile numbers for notices unless and until written notice of other names, addresses and facsimile numbers are provided by either or both parties are as follows:

If to Secured Party:

Affiliated Foods Midwest Cooperative, Inc.
1301 Omaha Avenue
Norfolk, NE 68701
Attn: Martin Arter, President/CEO
Fax No.: (402) 379-1588

If to Debtor:

Borowiak IGA Foodliner, Inc.
13 North 5th Street
Albion, IL 62806

(g)     Rights and Remedies Cumulative.  The rights and remedies of Secured Party under this Agreement are cumulative and are not in lieu of, but are in addition to any other rights or remedies available to Secured Party at law or in equity.  No course of dealing between Secured Party and Debtor or any failure or delay on the part of Secured Party in exercising any rights or remedies hereunder shall operate as a waiver of any rights or remedies of Secured Party and no single or partial exercise of any rights or remedies hereunder shall operate as a waiver or preclude the exercise of any other rights or remedies hereunder.

(h)     Costs of Enforcement.  In the event that Secured Party shall retain or engage an attorney or attorneys to collect or enforce or protect its interests with respect to this Agreement, including the representation of Secured Party in connection with any bankruptcy, reorganization, receivership or any other action affecting creditor's rights, and regardless of whether a suit or action is commenced, Debtor hereby agrees to pay all of the costs and expenses of such collection, enforcement or protection, including reasonable attorneys' fees, and Secured Party may take judgment for all such amounts.

(i)     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of Secured Party and its successors and assigns, and Debtor and its successors and permitted assigns.

(j)     Reinstatement of Obligations.  Debtor expressly agrees that to the extent a payment or payments to Secured Party, or any part thereof, are subsequently invalidated, declared to be void or voidable, set aside and are required to be repaid to a trustee, custodian, receiver or any other party under any bankruptcy act, state or federal law, common law or equitable cause, then to the extent of such payment or repayment, the obligation or part thereof intended to be satisfied and any Collateral given therefore including this Agreement shall be revived and continued in full force and effect as if said payment had not been made.

(k)     WAIVER OF JURY TRIAL.  DEBTOR AND SECURED PARTY HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, SUIT, COUNTERCLAIM, CROSSCLAIM OR OTHERWISE, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING

EXHIBIT A

DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY ACTS OR OMISSIONS OF SECURED PARTY AND ITS OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY DEBTOR AND SECURED PARTY AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. DEBTOR AND SECURED PARTY ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION 7(K) IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.

[The Remainder of This Page Intentionally Left Blank and Signature Page Follows]

EXHIBIT A

IN WITNESS WHEREOF, this Agreement has been duly executed by the Debtor and Secured Party as of the day and year first above-written.

SECURED PARTY:

Affiliated Foods Midwest Cooperative, Inc., a Nebraska corporation

By: _____

Its: _____VP / CFO_____

DEBTOR:

Borowiak IGA Foodliner, Inc., an Illinois corporation

By: _____

Its: _____PRESIDENT_____

Signature Page
Security Agreement

EXHIBIT A

KOLEY▩JESSEN

ATTORNEYS

koleyjessen.com

September 6, 2016

**VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED**

SuperValu, Inc.
11840 Valley View Road
Eden Prairie, MN 55344
Attention: Mark Gross

Re:   Supply Agreement, dated December 29, 2015, by and between Affiliated Foods
      Midwest Cooperative, Inc. ("AFM") and Borowiak IGA FOODLINER, Inc.
      ("Borowiak")

To Whom It May Concern:

My Firm represents AFM in connection with the above-referenced Supply Agreement. It has
come to our attention that SuperValu, Inc. ("SuperValu") may have been and/or is currently
interfering with the existing business relationship between AFM and Borowiak. To the extent
that SuperValu was not already aware, be advised that AFM has an existing long-term agreement
with Borowiak pursuant to the terms of the above-referenced Supply Agreement. Also be
advised that any early termination of the Supply Agreement other than in accordance with its
terms is an express breach of the Supply Agreement.

Also be advised that the Supply Agreement includes a confidentiality provision protecting any
confidential information of AFM that is disclosed to Borowiak. To the extent any such
information has been improperly disclosed to SuperValu or in the event that SuperValu in any
way misappropriates any trade secrets of AFM, AFM will take all necessary actions to protect
and defend its rights.

AFM hereby demands that SuperValu refrain from interfering with its existing business
relationship with Borowiak, and to the extent that any confidential information of AFM has been
improperly disclosed to SuperValu, AFM hereby demands the return and destruction of all such
information. Should you have any questions regarding the contents of this letter, please contact
me to discuss. Nothing contained herein is intended to be a waiver or admission against the
interests of AFM.

Sincerely yours,

Helmut E. Brugman

HEB:nho

cc:   Martin Arter, President, Affiliated Foods Midwest Cooperative, Inc.
      Carla Robertson, SuperValu, Inc.

4835-0845-0104 1

HELMUT E. BRUGMAN
DIRECT 402 343 3876
HELMUT BRUGMAN@KOLEYJESSEN.COM

EXHIBIT B

# KOLEY ▦ JESSEN

### ATTORNEYS

KOLEY JESSEN PC, LLO
1125 SOUTH 103RD STREET
SUITE 800
OMAHA, NE 68124

PHONE: 402.390.9500
FAX: 402.390.9005

koleyjessen.com

September 13, 2016

**VIA FED-EX**

SuperValu, Inc.
11840 Valley View Road
Eden Prairie, MN 55344
Attention: Mark Gross

Re:    Demand to Cease Tortious Interference; Litigation Hold Directive: Required
         Preservation of Data

Dear Mr. Gross:

I am enclosing a demand letter being sent simultaneously to Borowiak IGA Foodliner, Inc. ("Borowiak IGA"). As you know, my Firm represents Affiliated Foods Midwest Cooperative, Inc. ("AFM") in connection with its existing Supply Agreement, dated December 29, 2015, with Borowiak IGA (the "Supply Agreement"). Reference is made to the letter I sent to SuperValu, Inc. ("SuperValu") dated September 6, 2016, whereby SuperValu was instructed to cease any tortious interference with AFM's existing business relationship with Borowiak IGA.

AFM has been advised by Borowiak IGA that SuperValu and Borowiak IGA have been working together to transition the supply of goods from AFM to SuperValu, which is an express breach of the terms of the Supply Agreement. As set forth in the enclosed letter to Borowiak IGA, AFM will fully enforce all of the terms of its existing agreements with Borowiak IGA against Borowiak IGA, Trevor Borowiak personally, and SuperValu as a joint tortfeasor interfering with AFM's relationship with Borowiak. **Demand is hereby made that SuperValu immediately cease interfering with AFM's existing business relationship with Borowiak IGA.**

Also, as the initiation of litigation regarding the above referenced matter appears imminent, SuperValu's hard copy data as well as the electronic data contained in your computer systems may be very important as a source of discovery and evidence in this matter. You are required by law to take steps to ensure that all electronic data and hard copy data that is potentially relevant to this matter is preserved. In order to satisfy these legal obligations, please ensure that you preserve all electronic data and hard copy data, including but not limited to:

| | |
|---|---|
| • Email | • Microsoft Office documents |
| • PDF Files | • TIFF Files |
| • TXT Files | • Databases |
| • Calendars | • Computer Usage Logs |
| • Internet Usage Logs | • Accounting Systems |
| • Cell Phones (and their cameras) | • Electronic Records |
| • Personal Data Devices | |

4822-7953-3624.1

HELMUT E. BRUGMAN
DIRECT: 402.343.3870
HELMUT.BRUGMAN@KOLEYJESSEN.COM

EXHIBIT C

- Text Messages
- Books, Records, Documents, Correspondence

- Caller ID Records
- Files
- Social Media Postings
- Social Media Messages

Such electronic information or data may reside on workstations, laptops, network servers, removable media, handheld devices, voicemail, and backup tapes. If you outsource the storage of your electronic or hard copy information, please immediately notify your provider that its direct assistance is required to ensure that electronic and hard copy information is safeguarded and preserved to the same degree as if it was under your control.

Any question or doubt about the relevance of a particular file, email, or other electronic data should be resolved in favor of preserving and retaining information. Failure to preserve relevant information may result in significant penalties and sanctions against you.

At the network and systems administration level, this directive requires you or your service provider to preserve and retain all potentially relevant files stored on servers and to refrain from doing any administrative work that has any potential to destroy potentially relevant files. In addition, all automatic deletion functions should be disabled on both the network and individual workstation level. All back-up tapes must be preserved and pulled from the recycling rotation and all appropriate staff should be informed to cease and suspend any personal activities and practices that could result in the destruction or modification of relevant electronic documents. Forensically sound and complete images of mailboxes, hard drives and network drives should be created upon receipt of this directive so as to preserve potentially relevant meta-data. As for hard copy data, please likewise suspend any document retention policy that may require the destruction of such records thereby ensuring that all records that may be relevant to this lawsuit are preserved.

Sincerely yours,

Helmut E. Brugman

HEB:nho

Enclosure

cc:   Martin Arter, President, Affiliated Foods Midwest Cooperative, Inc. (via email)
      Carla Robertson, SuperValu, Inc.

4822-7953-3624.1

EXHIBIT C

 **SUPERVALU.**   11842 Valley View Road   P 952 828-4000   www.supervalu.com
Eden Prairie, MN 55344   F 952 828-4403

Kimberly J. Myrdahl
(952) 828-4159
Fax: (952) 828-4403
E-Mail: kim.myrdahl@supervalu.com

VIA E-MAIL and OVERNIGHT MAIL

September 16, 2016

Helmut E. Brugman
Koley Jessen PC, LLO
1125 South 103rd Street
Suite 800
Omaha, NE 68124

RE:   September 6 and September 13, 2016 letters related to Borowiak IGA

Dear Mr. Brugman:

This is to acknowledge your letters dated September 6 and September 13 sent to SUPERVALU regarding Borowiak IGA.

SUPERVALU has in no way interfered with any contractual relationship between Borowiak and AFM. Borowiak IGA approached SUPERVALU about the possibility of SUPERVAU supplying its stores after learning of the impending merger of Affiliated Foods Midwest Cooperative, Inc. ("AFM") with Associated Wholesale Grocers, Inc. Further, we understand that Borowiak is in the process of resolving any contractual issues with AFM.

Your September 13 letter includes a reminder of the obligations to preserve evidence. While we do not agree with your description of that obligation, we have taken all appropriate steps to preserve evidence and meet SUPERVALU's obligations in that regard. We expect that AFM will also take all appropriate steps to comply with its preservation obligations.

Should you have any further need to communicate about this matter, please direct them to me and not my client.

Very truly yours,

SUPERVALU INC.

Kimberly J. Myrdahl
Deputy General Counsel, Vice President and Chief Compliance Officer

KJM/lae

EXHIBIT D

**Tonia Campbell**

| | |
|---|---|
| **From:** | Helmut Brugman |
| **Sent:** | Tuesday, October 11, 2016 8:51 AM |
| **To:** | Tonia Campbell |
| **Subject:** | FW: |

**From:** "Trevor Borowiak" <trevorborowiak@hotmail.com>
**Date:** October 7, 2016 at 9:44:03 AM CDT
**To:** "MArter@afmidwest.com" <MArter@afmidwest.com>

Marty,

As you know, I delivered to you on September 26, 2016 a copy of a complaint to be filed in the Nebraska

federal court against AFM. As you know, we agreed to meet on Tuesday, October 4, (which we did) in

an attempt to resolve the issues raised in the complaint, but that didn't happen.

Since a grocery delivery by AFM is already in place to be made on Tuesday, October 11, 2016, we will

accept that delivery and allow for payment to be made by ACH. All future deliveries, however, should

be stopped. Borowiak's ACH authorization is terminated and not permitted for use by AFM or any

successor (e.g. AWG) except for payment of the amount of groceries delivered by AFM to Borowiak on

October 11, 2016.

Please confirm AFM's acknowledgment and agreement to the above.

--
Trevor Borowiak, President
Borowiak's IGA
618-302-2032-Office
618-924-2660-Cell

This e-mail and any attachments it may contain are confidential material for the sole use of the intended

EXHIBIT E
1

recipient. If you are not the intended recipient, please be aware that any disclosure, copying, distribution or use of this e-mail or any attachment is prohibited. If you have received this e-mail in error, please contact the sender and delete all copies. Thank you for your cooperation.